**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

SHELBA  J. SMITH,                               :

                Plaintiff,            :
                                       Case No. 3:08CV00281
 vs.                                          :
                                       District Judge Walter Herbert Rice
MICHAEL J. ASTRUE,                   :   Magistrate Judge Sharon L. Ovington
    Commissioner of the Social
    Security Administration,              :

               Defendant.            :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.      INTRODUCTION

Plaintiff Shelba J. Smith suffers from several physical and mental health

issues,  including vision problems (loss of her left eye when she was a teenager

and increasingly restricted field of vision in her remaining right eye), interstitial

cystitis, depression, anxiety, obsessive compulsive disorder ["OCD"], and bipolar

disorder.  In May 2004, she  sought financial assistance from the Social Security

Administration by filing applications with the Social Security Administration

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

seeking Disability Insurance Benefits ["DIB"] and Supplemental Security Income ["SSI"]. In both applications she asserted that she has been under a disability since June 30, 2001. (Tr. 49-51).[2] Plaintiff qualified for disability insured status through March 31, 2005. (Tr. 14, 24, 52; Doc. #9 at 1).

After initial denials of her applications and a later administrative hearing (Tr. 418-54), Administrative Law Judge ["ALJ"] James I.K. Knapp issued a partially favorable decision, finding that Plaintiff was disabled as of October 1, 2005. He nonetheless denied her DIB and SSI applications for the period from June 30, 2001 through September 30, 2005, based on his conclusion that Plaintiff's impairments did not constitute a "disability" as defined by the Social Security Act within that time. (Tr. 13-26).

Plaintiff brings this case challenging the Commissioner's conclusion that she was not under a "disability" prior to October 1, 2005. The Commissioner's decision is subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record, and the record as a whole.

---

[2] The SSI exhibits were not included in the administrative transcript.

Plaintiff seeks, at a minimum, remand of this case to the Social Security Administration to correct certain alleged errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.   BACKGROUND

### A.   <u>Plaintiff and Her Testimony</u>

At the time of the ALJ's decision, Plaintiff's age (45) placed her in the category of a "younger individual" for purposes of resolving her SSI and DIB applications. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c)[3]; (*see also* Tr. 36).

Plaintiff has a high school education. *See* 20 C.F.R. § 416.964(b)(4); (see also Tr. 108). Her past employment involved work as a foster parent, after-school childcare provider and bartender. (Tr. 104, 150).

During the ALJ hearing, Plaintiff testified that she lived in a house with her husband and 15-year-old son. (Tr. 422). She said that she drove a car approximately three times per month. (*Id*.). Her driver's license had been renewed in March 2006 with a restriction requiring her to have mirrors on the outside and inside of her car. (Tr. 422-23). Two years before she was driving once or twice a week.

---

[3] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

Plaintiff testified that in 2002, she stopped caring for children after school. (Tr. 424-25). She said that she discontinued that job due to anxiety and bipolar disorder, which interfered with her ability to speak with the children's parents in a professional manner, as well as due to interstitial cystitis, which caused her to have to go to the bathroom constantly. (Tr. 425). She occasionally has cared for 16- and 17-year-old foster children in her home, but she stopped due to the stress. (Tr. 425-26).

She has a prosthetic left eye. Her right eye vision got worse at some point in 2005 and she had to change her eyeglasses prescription. She stated the worsening of her vision occurred in "a real short amount of time" and her doctor changed her eyeglasses prescription twice in one year. (Tr. 427). Plaintiff further testified that her interstitial cystitis was treatable but not curable, and that she was taking four medications. (Tr. 428). She said that due to her bladder problem, she sleeps about four hours a night and takes two tranquilizers. (Tr. 431).

Plaintiff further testified to her depression and anxiety. She suffered from panic attacks, usually when she was around people or when she felt "overwhelmed by being rushed or having a time table." (Tr. 429). She said that she had been under the care of a psychiatrist, Dr. Gollamudi, for between three to

five years, and a psychologist, Sharon Walk, for two years.  (Tr. 430).  She had

taken Prozac for nine or 10 years and Xanax for two years.  (Tr. 431).

As to her daily activities, Plaintiff testified that she did laundry and, if she

was not too depressed, other household chores.  (Tr. 432).  She read her Bible and

watched television.  On average she took two or three naps during the daytime,

each lasting about two hours.  (Tr. 431-32).  She said that she prepared only about

two meals a week and that her son prepared most of the other meals.  She said

that her son also did most of the vacuuming and that her husband did all of the

shopping.  (Tr. 433).  She had not been inside a store for two years.  She estimated

that she went to church once a month.  (Tr. 434).

Plaintiff estimated that she could stand for approximately 10 minutes at a

time, after which she lost her "thought process" and became tired.  (Tr. 435).  She

also reported that she had trouble retaining information, such as directions.  (Tr.

439).

B.     **Medical Evidence and Opinions**

1.     *Treating physicians*

Plaintiff has treated with optometrist[4] Gregory J. Bruchs, O.D., since at

least 1991.  (*See* Tr. 251).  Dr. Bruchs apparently first performed a comprehensive

---

[4]The ALJ's decision identifies Dr. Bruchs as an ophthalmologist (*see* Tr. 18), but that specialty is not consistent with the "O.D." designation.  (*See also* Tr. 244, 251).

test of Plaintiff's visual fields on October 31, 2005. (*See* Tr. 250). On December 15, 2005, Dr. Bruchs prepared a letter opining that Plaintiff met the listing for "disorders of vision" because she has a prosthetic left eye and had lost a total of 81 percent efficiency of her visual system. (Tr. 244). He noted that "[v]isual fields have only been recently done and do show a significant constriction, which could be longstanding." (*Id*.). He further reported that

> [Plaintiff] has decent central vision, and does not present with a significant deficit there, but her visual field deficit would decrease her mobility somewhat. This, combined with no vision left eye, gives her a significant mobility disadvantage. Her walking safety may be affected. Since she has constricted visual fields, she probably would not pass the peripheral test at the driver's license station, and therefore would not get a license. Doing as poorly as she did on the peripheral test, I would say she should not be driving. I believe just based on visual acuity with the proper correction(s), she would be able to do jobs that require some reading, some spot reading and definitely in a sitting position. Doing work that would require standing, walking, and at the same time using the eyesight would be quite a strain for her, and she may not be able to do that, for very long. Plus, that could affect her safety.

(Tr. 245).

Neuroophthalmologist John A. Fleischman, M.D., thereafter examined Plaintiff on referral from Dr. Bruchs. (Tr. 366-87). In January 2006, Dr.

Fleischman reported that Plaintiff has a "[s]everely constrict[ed] visual field" with "suspect[ed] functional visual loss." (Tr. 372).

Plaintiff has been treating with psychiatrist Ramakrishna Gollamudi, M.D., since October 29, 2003. (Tr. 322). On January 9, 2006, Dr. Gollamudi opined that Plaintiff suffers from anxiety, depression, mood swings, insomnia, poor concentration and memory (Tr. 322), with a "limited and unsatisfactory" ability to perform many work-related functions. (Tr. 320-21). Dr. Gollamudi also opined that Plaintiff's restrictions had existed "at least since June 30, 2001." (Tr. 322; *see also* Tr. 390).

On October 10, 2006, Dr. Gollamudi, in conjunction with Plaintiff's counselor, Sharon Walk, MA, LPCC-SC, again opined that Plaintiff had many limitations with respect to mental abilities critical to performing unskilled work. (Tr. 388-90). At that time, Dr. Gollamudi reported Plaintiff to be "highly anxious for a variety of reasons. She has ongoing panic disorder issues[, d]oesn't feel comfortable in groups of a few people[, d]oesn't focus or concentrate because of mental health issues." (Tr. 390).

Urologist Sharat Kalvakota, M.D., treated Plaintiff for chronic cystitis since at least 1995. (Tr. 225, 238). Plaintiff underwent numerous procedures for this condition over an 11 year period. (Tr. 183, 197, 208, 218, 228, 238). On September

7

8, 2006, Dr. Kalvakota noted that Plaintiff had no complaints and was doing well. (Tr. 359).

### 2. *State Agency physicians*

Michael R. Stock, M.D., reviewed the medical evidence at the request of the Ohio Bureau of Disability Determination ["BDD"] in August 2004. (Tr. 176-80). Dr. Stock opined at that time that Plaintiff had no exertional limitations, but had visual and hazard restrictions due to her impaired vision. (*Id.*). Cindi Lynn Hill, M.D., another state agency physician, affirmed Dr. Stock's opinion in January 2005. (Tr. 180).

On August 10, 2004, Plaintiff underwent a consultative psychological examination by J. William McIntosh, Ph.D. (Tr. 149-53). Dr. McIntosh reported that Plaintiff had been receiving mental health services for approximately one year when he saw her, but that she never had been psychiatrically hospitalized. Plaintiff told him that she was an alcoholic until approximately 11 years before. She worked as a foster mother for anywhere from two to four teenaged children in need of therapy. Plaintiff reported that she could not work because she had "real bad panic attacks if I am around people. It's hard for me to take several things on at one time." (Tr. 150). Although Plaintiff said that she was nervous to

some extent "all the time," Dr. McIntosh observed no outward signs of anxiety. (Tr. 151).

As to her daily activities, Dr. McIntosh reported that Plaintiff spent most of her time cleaning and caring for her children. She said she took her foster daughters to their therapy appointments and that she did three or four loads of laundry on a daily basis and cooked two meals every day. She said she did vacuuming, dusting and bed making approximately once per week and also washed windows. She said she also helped provide care for four cats, a dog, and two turtles. She occasionally watched movies and television and she liked collecting angels or other knickknacks as a hobby. She participated in a church group and occasionally went to Sunday services. She sometimes helped out sponsors with AA activities. She wrote to her brother in prison. She bathed and groomed her hair daily. (Tr. 152).

Dr. McIntosh concluded that Plaintiff's ability to understand, remember and carry out one- or two-step job instructions appeared to be "fully intact," although she became very anxious with increased stress and was nervous in public situations. (Tr. 153). Dr. McIntosh diagnosed a generalized anxiety disorder with obsessive/compulsive features and assigned a Global Assessment of Functioning ["GAF"] score of 63. (*Id.*).

Psychologist John S. Waddell, Ph.D., reviewed the file on behalf of the Ohio BDD in August 2004. (Tr. 161-75). Dr. Waddell opined that Plaintiff's anxiety disorder did not cause marked limitations in any area of work-related functioning, but would cause moderate limitations in the areas of social functioning and concentration, persistence and pace. (Tr. 171). Dr. Waddell's assessment was affirmed by another state agency reviewing psychologist, David J. Deitz, Ph.D., in January 2005. (Tr. 161).

C.    **Vocational Expert Testimony**

A hypothetical question posed to the vocational expert during the administrative hearing directed him to consider an individual with Plaintiff's vocational characteristics who was limited to no climbing ladders or scaffolds, and no performing work that required a good ability to balance. (Tr. 443). The individual could not walk on uneven surfaces. She could not perform work that required good depth perception or peripheral vision on the left, and could not work at unprotected heights or around moving machinery. (Tr. 443-44). She could have no contact with the public and only occasional contact with supervisors and co-workers. (Tr. 444). She could not perform work that involved complex instructions, and was limited to low-stress jobs that did not

involve above-average pressure for production or fixed production quotas.  The work had to be routine in nature and could not be hazardous.

The vocational expert opined that a hypothetical individual with these limitations could perform 5,000 medium exertional level jobs in the regional economy such as machine packager and hand packager.  (Tr. 443, 445).  At the light level, the individual could perform about 8,000 jobs in the regional economy including work as an assembly machine tender and injection molding machine tender.  At the sedentary exertional level, the individual could perform 1,000 jobs in the regional economy including work as a microfilm document preparer and wire insulator.  (Tr. 445).

## III.   ADMINISTRATIVE REVIEW

### A.      "Disability" Defined and the Sequential Evaluation

The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).  A DIB/SSI applicant

bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  (*See* Tr. 13-14); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.** **The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the insured-status requirement for DIB eligibility through March 2005. (Tr. 14, 24). The ALJ also found at Step 1 that Plaintiff had not engaged in substantial gainful activity since her claimed disability onset date of June 30, 2001. (Tr. 24).

The ALJ found at Step 2 that Plaintiff has the severe impairments of loss of left eye vision, impaired right eye vision, and panic disorder without agoraphobia. (*Id.*).

The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (*Id.*).

At Step 4 the ALJ concluded that prior to October 1, 2005, Plaintiff lacked the Residual Functional Capacity to climb ladders or scaffolds; do any job otherwise requiring a good ability to maintain balance; do any job requiring good depth perception or peripheral vision to the left; work at unprotected height or around moving machinery; do any work that would require her to have contact with the public; have more than occasional contact with supervisors or coworkers; or do other than low stress work activity (*i.e.*, no job involving above

average pressure for production, fixed production quotas, work that is other than routine in nature, or work that is hazardous).  (*Id.*).

The ALJ further found that Plaintiff is unable to perform her past relevant work. (Tr. 25).

The ALJ's assessment of Plaintiff's Residual Functional Capacity, along with his findings throughout the sequential evaluation, led him to conclude that Plaintiff was not under a disability and thus not eligible for DIB or SSI during the relevant period.  (Tr. 24-26).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria."  *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Bowen*, 478 F.3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "'more than a scintilla of evidence but less than a preponderance . . ."  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F.3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.   DISCUSSION

### A.   The Parties' Contentions

Plaintiff identifies the following 11 alleged errors by ALJ Knapp:

1.      Although Judge Knapp found that Ms. Smith's visual loss, which reached listing level in October 2005, was not disabling

before that date, there was no medical opinion to that effect in the record, and in fact the opinion of her treating source, Dr. Bruchs, was to the contrary and his opinion was unrebutted.

2.  Judge Knapp found Ms. Smith's interstitial cystitis was not likely to have existed for a period of 12 months before October 1, 2005 (the date he found she met listing § 2.03) and concluded that therefore, her interstitial cystitis was not ever a "severe" condition, however there is no such "requirement"- that to find a condition to be "severe" the 12 month durational requirement for that condition (in this case interstitial cystitis) must have been completed before she met the listing for another condition.

3.  Judge Knapp concluded that Ms. Smith's panic attacks and anxiety were not as severe as opined by her longtime treating Psychiatrist, Dr. Gollamudi[,] based upon the state agency record reviewer's opinion given on August 24, 2004 (tr. pp 161-175). However that record reviewer's opinion was given before the addition to the record of many of Dr. Gollamudi's treating notes and office records (tr. pp 320-329, 388-400) and all of Dr. Gollamudi's Medical source statements giving his opinions of Ms. Smith's symptoms and limitations from her mental impairments.(tr. pp 320-322 in January 2006; pp 388-390 in October 2006).

4.  In failing to find that her Interstitial Cystitis was a severe medical condition and to consider the limitations therefrom as required by SSR 02-2p, between her AOD- June 30, 2001 and the date he found her vision restrictions met a listing on October 1, 2005. Dr. Kalvakota's records indicate that he had diagnosed and treated Ms. Smith for that condition for at least 10 years before October 1, 2005.

5.  In failing to consider all of the limitations of her mental impairment, which limitations, the VE testified, (and SSR 96-9p and POMS § DI 25020.010 direct) would eliminate all competitive employment.

6.    In failing to consider that although there was no objective test documenting listing level visual impairment until the test in October 2005, (there were no "field of visions tests" at all until that date) Dr. Bruch's treatment records and his opinion letter document that her eyesight was failing for years and that she most likely was at listing level as of her DLI of 3-31-05, six months and a day before Judge Knapp found her disabled.

7.    In relying solely upon his own "medical opinion" in determining that Ms. Smith did not first met or equaled [sic] listing § 2.03 until October 1, 2005. There was a gap of over a year between the 2 eye exams of Dr. B[ru]ch, one in September 2004 (tr. p255) and the next one in October 2005, (tr. pp 244,245,250 ) which documented that her peripheral vision loss met listing § 2.03. In deciding at what point in that 13 month gap between tests that Ms. Smith first "met or equaled" that listing, Judge Knapp concluded that Mrs. Smith she did not "meet or equal" the listing until the October 2005 test. That conclusion was arrived at with out the benefit of any medical advice to support it. In fact it was contrary to the only medical opinion addressing that issue, Dr. Bruch, her treating physician, who opined that it was likely to have been a longstanding restriction prior to that October 2005 test (tr. pp 244,245).

8.    Even if he were correct and her vision impairment did not reach the "meet or equal" listing level until October 2005, in failing to consider that [ ] she had severe and disabling vision limitations in her only remaining eye (right) before that date, which he did not include within the hypothetical question posed of the VE, and none of which he considered when reaching his decision that she was not disabled until that test documented listing level limitations.

9.    In failing to develop the medical record. If the judge questioned the validity of the treating physicians' opinions then it was his duty to make inquiry of those treating sources rather than substitute his own "medical opinion" that there

was no basis for those opinions. If he questioned Dr. Gollamudi's diagnosis of panic disorder with agoraphobia, then his duty was to ask Dr. Gollamudi for the basis of such diagnosis; if he concluded that because there were no test of Ms. Smith's vision field in her right eye before October 2005, that her field of vision in that remaining eye was not limited until that date, then his duty was to ask Dr. Bruch at what point Dr. Bruch felt she met the listing, and what limitations she had between the AOD and the date he felt she met the listing; if he felt that despite treatment since the mid 1990's, her interstitial cystitis diagnosis was not "severe" and not likely to last for 12 months, then his duty was to make appropriate inquiry of Dr. Kalvakota.

10. In failing to consider her limitations from the combination of all of her severe medical impairments for the period of time between her AOD and the date he did find her disabled, especially those that were not in the record at the initial and reconsideration levels and not considered by the state agency record reviewers when rendering their opinions that Ms. Smith was not "disabled".

11. In failing to give controlling weight to the medical opinions of her treating sources.

(*See* Doc. # 9 at 10-13).

Defendant counters that Plaintiff's various challenges amount to a single issue: whether substantial evidence supports the Commissioner's non-disability determination. (Doc. #12 at 1). He contends that it does, detailing such evidence. Plaintiff's reply narrows its focus to three issues addressed by Defendant's opposing memorandum, urging that her interstitial cystitis is a "severe" condition, that the ALJ failed in his duty to develop the record regarding the

onset of her visual disability, and that the ALJ's decision is deficient not for lack of substantial evidence but for failure to apply the correct legal criteria. (Doc. #13, 1-4).

### B. Medical Source Opinions

#### 1. *Treating Medical Sources*

Key among the standards to which an ALJ must adhere is the principle that greater deference is generally given to the opinions of treating medical sources than to the opinions of a non-treating medical source. *Rogers*, 486 F.3d at 242; *see* 20 C.F.R. § 404.1527(d)(2). This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations . . ." 20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544; *see also* § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] . . . or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected . . .

Social Security Ruling 96-2p, 1996 WL 374188 at *4. The Regulations require the ALJ to continue the evaluation of the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

## 2. *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180 at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id*. at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. §404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.1572(f); *see also* Ruling 96-6p at *2-*3.

> C. **Analysis**

>> 1. *Date that visual impairment became "disabling"*

The first and seemingly most compelling argument raised in Plaintiff's Statement of Errors is her general contention that the ALJ erred in finding that Plaintiff's visual impairment did not become disabling until October 1, 2005.  (*See* Doc. #9 at 10-11; Doc. #13 at 3-4).  A challenge to the onset date assigned by the ALJ to her visual disability is implicated by several of Plaintiff's overlapping allegations of error.  Specifically, Plaintiff urges (in alleged error #1) that no medical evidence indicates that her visual impairment was <u>not</u> disabling <u>before</u>

October 1, 1995, leaving only Dr. Bruch's unrebutted opinion; (in alleged error #6) that the ALJ failed to consider the absence of prior objective medical tests, which in light of recorded declines in her vision over the years suggests that she probably was disabled earlier; (in alleged error #7) that the ALJ's finding that Plaintiff was not disabled until October 1, 2005 was based only on his own unqualified medical supposition; (in alleged error #9) that the ALJ failed to develop the record as to precisely when Plaintiff's visual disability began and what limitations she had before; and (in alleged error #11) that the ALJ failed to give controlling weight to the opinion of treating physician Dr. Bruch. (Doc. #9 at 10-13).

Critical to Plaintiff's position on this point, then, is the precise nature of the opinion that Dr. Bruch actually rendered, as well as any other evidence regarding Plaintiff's visual limitations. A review of Dr. Bruch's December 15, 2005 letter confirms that Plaintiff's argument hinges on Dr. Bruch's observation that the "significant constriction" of Plaintiff's visual fields then found to meet Listing 2.03 [20 C.F.R. pt. 404, subpt. P, app. 1 § 2.03(C)] "could be longstanding." (Tr 244). Aside from a vague allusion to other "treatment records . . . [showing] that her eyesight was failing for years" (Doc. #9 at 11), Plaintiff has directed this Court to nothing else in the record that would lend support to her contention that

"she most likely was at listing level as of her [date last insured] of [March 31, 2005], six months and a day before Judge Knapp found her [to be] disabled." (Doc. #9 at 11). Significantly, the ALJ specifically noted that Plaintiff herself "was vague in her testimony with respect to when in 2005 her right eye vision deteriorated." (Tr. 16).

Plaintiff's proposed interpretation notwithstanding, Dr. Bruch's statement that Plaintiff's visual field impairment existing in December 2005 "could be longstanding" does not equate to a deference-entitled treating physician's opinion that Plaintiff was visually disabled prior to the March 31, 2005 expiration of her insured status. Dr. Bruch specifically remarked that Plaintiff's right eye had "maintained corrected 20/20 vision through at least 2001" (Tr. 244), and records of the examination he performed on September 25, 2004 reflect no visual field contraction at that time, nor anything else suggesting that Plaintiff might become visually disabled within six months (*i.e.*, before March 31, 2005). (*See* Tr. 255). Additionally, in the very same letter containing the "could be longstanding" comment, Dr. Bruch took care to note that his treatment relationship with Plaintiff had been "primarily for her artificial eye condition," and that her newly-discovered visual field issues warranted referral to a different specialist. (Tr. 245). Given this implicit acknowledgment that Dr. Bruch, as an

23

optometrist, considered himself less than optimally qualified to deal with this aspect of Plaintiff's vision problems, as well as the fact that Dr. Bruch's "could be longstanding" remark cannot be deemed "well supported" for purposes of the treating source rule, the ALJ cannot be said to have erred by failing to give controlling weight to Dr. Bruch's equivocal opinion about the possible duration of Plaintiff's visual field constriction.

Plaintiff's argument that the ALJ erred by failing to develop further medical evidence regarding the date her visual impairment became disabling is equally unavailing. According to 20 C.F.R. § 404.1512(e), the Commissioner's representatives may re-contact treating medical sources "[w]hen the information we receive from [them] . . . is inadequate for us to determine whether you are disabled." However, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination[ ] rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). An ALJ need <u>not</u> seek further clarification from a treating physician if the record <u>is</u> sufficient to allow him to make a disability determination. *See DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 416 (6th Cir. 2006) ("Generally, an Administrative Law Judge need re-contact a medical source only if the evidence received from that source is 'inadequate' for a disability

determination"). A medical opinion is not "inadequate" simply because it disagrees with that of another medical professional, *id.*, and failure to re-contact medical sources is harmless where a plaintiff "did not identify or offer to present additional evidence from [her] treating physicians showing that [she] was disabled during the relevant period." *Melton v. Comm'r of Soc. Sec.*, 178 F.3d 1295 [table], 1999 WL 232700, at *5 (6th Cir. 1999).

Although a referral to another medical expert "might have been helpful here," Plaintiff has not met the requisite burden of establishing that such an examination was "*necessary*" in her case. *See Robinson v. Sullivan*, 337 F.2d 1087 [table], 1989 WL 119382, at *1 (6th Cir. Oct. 12, 1989). "A report is not necessarily incomplete simply because it does not provide the evidence sought by a claimant." *Brown v. Sec'y of Health & Human Servs.*, 911 F.2d 731 [table], 1990 WL 121472 at *5 (6th Cir. Aug. 22, 1990). The ALJ's discretion would seem to be particularly broad where, as here, the claimant's treating physician had an opportunity yet apparently chose not to project a date on which the claimant's condition likely became disabling. Although Plaintiff "now contends that the Commissioner erred by not developing the record in this regard," Plaintiff and her counsel failed to place relevant evidence before the ALJ, "and it is the

claimant's responsibility" to do so. *Stevens v. Apfel*, 165 F.3d 28 [table], 1998 WL 708728, at *2 (Sept. 29, 1998) (citing *Landsaw*, 803 F.2d at 214).

In light of the foregoing, the only remaining aspect of the ALJ's finding regarding Plaintiff's visual disability that might appear troubling is his conclusion that Plaintiff became disabled precisely as of October 1, 2005. (*See* Tr. 18). Given that Dr. Bruch's disability opinion was based upon an examination performed <u>after</u> that date (Tr. 249-50), and that no medical source appears to have opined that Plaintiff qualified as "disabled" on October 1 of that year, the ALJ's choice of that date does ring of an arbitrary assignment. To the extent that such choice may have constituted an error, however, the Court finds it to have been a harmless one, as "a different outcome on remand is unlikely" as to this issue. *See Wilson*, 378 F.3d at 546. Substantial evidence of record would have supported a finding that Plaintiff was not visually "disabled" until the date on which objective testing documented the extent of her peripheral vision loss. Plaintiff cannot complain of injury due to the ALJ's decision to assign a disability date <u>earlier</u> than the date that the extent of her vision loss was proven definitively, particularly given that no credible evidence of record has been shown to warrant assigning a disability date prior to March 31, 2005, her last date insured.

Plaintiff's allegations of error related to the ALJ's determination of a October 1, 2005 visual disability date therefore are not well taken.

### 2. *Finding that interstitial cystitis not "severe"*

Plaintiff also complains that the ALJ erred in concluding that her interstitial cystitis was not a severe condition because it had not persisted for 12 months, in not requesting further medical documentation, and in not giving controlling weight to the opinion of her treating physician. (*See* Doc. #9, alleged errors ##2, 4, 9, 11; Doc. #13 at 1-3). Although Plaintiff correctly observes that her treatment records for bladder problems go back at least 10 years before her assigned disability date (*see* Tr. 225), the Court notes that her initial diagnosis in March 1995 actually was one of "[c]hronic cystitis <u>without</u> interstitial cystitis." (Tr. 238)(emphasis added). Accordingly, the more serious "interstitial cystitis" diagnosis has not spanned her entire history of bladder problems.

Irrespective of that distinction, however, the ALJ did not overlook Plaintiff's treatment history for cystitis. Rather, while acknowledging her extensive history of bladder problems, the ALJ nonetheless concluded that "her treatment records do not substantiate the allegations that she has been having a chronic problem <u>causing</u> <u>significant</u> <u>functional</u> <u>limitations</u>." (Tr. 17)(emphasis added). This illustrates that the ALJ's resistance to finding that condition to be

disabling rested on questions not as to the diagnosis or the duration of her condition, but as to the persistence and severity of her related symptoms. For example, the ALJ noted that treatment records relative to Plaintiff's complaints of pain associated with cystitis indicated that those symptoms appeared "not with a frequency significant enough to interfere with work activity," and that she intermittently reported "doing better on medications" prescribed for her condition. (*Id*.). He also later elaborated as follows:

> Claimant testified that she had to go to the rest room every [20] minutes, but such a complaint is not supported by the treatment record, and in particular with respect to any period of [12] months or longer prior to October 2005.

(*Id*.).

Context makes clear that the ALJ was not denying that Plaintiff had suffered from interstitial cystitis for 12 months, but instead was commenting on the dearth of objective medical evidence corroborating the extreme bladder urgency and emptying frequency [every 20 minutes] described by Plaintiff, over a period of sufficient length to constitute a significant functional limitation. Although Plaintiff correctly observes that the Social Security rulings explicitly acknowledge that interstitial cystitis can be a disabling condition (*see* Doc. #13 at 2-4; SSR 02-2p), ), that mere recognition does not overcome treatment records

suggesting that Plaintiff usually was able to function fairly well despite the condition. Administrative law judges are empowered to make credibility determinations when a claimant's subjective complaints are not consistent with objective medical evidence. *See Rogers*, 486 F.3d at 247-48. Substantial evidence supports the ALJ's implicit finding that Plaintiff's allegations were not wholly credible, including her treating urologist's September 8, 2006 notation that Plaintiff had no complaints and was doing well at that time (Tr. 359), as well as the multi-year lapse between Plaintiff's cystitis diagnosis and her claim to be disabled thereby.

As to Plaintiff's additional allegation that the ALJ failed to develop the medical record or in his "duty to make appropriate inquiry of Dr. Kalvakota" to substantiate the severity and duration of Plaintiff's urinary tract condition (Doc. #9, p. 12), the Court repeats the admonition that "[t]he burden of providing a . . . record . . . complete and detailed enough . . . rests with the claimant." *Landsaw*, 803 F.2d at 214. The ALJ had no affirmative obligation to seek out additional evidence from Plaintiff's own treating physician simply because the record produced by Plaintiff "d[id] not provide the evidence sought by" Plaintiff to establish that the symptoms caused by her interstitial cystitis were severe and prolonged enough to constitute a disability. *See Brown*, 1990 WL 121472 at *5.

Indeed, Plaintiff's contention that the ALJ neglected to seek out adequate medical substantiation (Doc. #9, alleged error # 9) seems somewhat at odds with her contention that the ALJ failed to give controlling weight to the opinions of her treating doctors.  (*Id.*, alleged error #11).  Plaintiff's Statement of Specific Errors identifies no "opinion" of Dr. Kalvakota that, if accepted by the ALJ, would have confirmed the alleged disabling effect of her interstitial cystitis.   For all the foregoing reasons, Plaintiff's assignment of error based on the ALJ's failure to designate her interstitial cystitis a "severe" condition is without merit.

### 3.    *Finding that mental impairments not "severe"*

Plaintiff next contends that the ALJ also erred in concluding that her panic attacks and anxiety were not as severe as opined by her treating psychiatrist and did not render her disabled for purposes of competitive employment, without further developing the record or considering all of the limitations caused by her condition.  (Doc. #9, alleged errors ## 3, 5, 9, 11).  While ALJ Knapp found that Plaintiff did have the "severe impairment[ ]" of "panic disorder," he rejected the assertion that she also suffered from agoraphobia.  (Tr. 24).  Despite Dr. Gollamudi's diagnosis of panic disorder with agoraphobia, the ALJ found that "the claimant's activities of daily living indicate that she does a lot of errands in public places," with "no evidence that [she] endures her public activities with

marked distress or anxiety." (Tr. 17). Specifically, he related Plaintiff's reports to BDD examiner Dr. McIntosh that "she took her foster daughters to their therapy appointments," "participated in a church group and occasionally went to Sunday services," and "sometimes helped out sponsors with AA activities." (Tr. 21). He also noted that Dr. Gollamudi had opined that Plaintiff had been restricted by mental health issues since June 30, 2001, even though Plaintiff "did not begin treatment with Dr. Gollamudi until October 25, 2003" and Dr. Gollamudi's own progress notes "report symptom improvement until August 2006." (Tr. 20). The ALJ thus concluded that "the evidence is insufficient to establish that the claimant's mental impairment includes agoraphobia." (Tr. 17).

Based on such evidence and the conflicts inherent therein, the ALJ also concluded that "there is no evidence that establishes disability earlier than October 2005 based on visual or mental impairment alone or in combination." (Tr. 20). He observed that Dr. Gollamudi had assigned Plaintiff a GAF score of 65 in November 2003, "indicative of only some moderate limitations in social and occupational functioning." (Tr. 21). The ALJ stated that the limitations documented had been addressed adequately by the workplace restrictions included in his residual functional capacity assessment (*id.*), effectively

discounting as not credible any additional limitations that Plaintiff might seek to impose.

Noting Plaintiff's mental health treating sources' assessments submitted in 2006 (Tr. 20), the ALJ conceded that Plaintiff's "mental limitations may well have increased since October 1, 2005 based on recent treating source information," but nonetheless found it "unnecessary to evaluate her mental limitations subsequent to that date, because she has been disabled since that date" by her visual impairment. (Tr. 19). ALJ Knapp's conclusions thus were supported by substantial evidence.

The ALJ also recited and applied the appropriate standards in analyzing the treating source opinions. (*See* Tr. 20). Concluding that Dr. Gollamudi's "opinion of a disabling level of limitation is inconsistent with his own treatment records and with the claimant's self-described level of activity," the ALJ decided that treating psychiatrist's opinion was "not entitled to controlling weight," and "lack[ed] the necessary supportability and consistency to entitle it to even deferential weight." (Tr. 21). Once again, the ALJ cannot be deemed to have erred by failing to develop the record further simply because Plaintiff's treating physician had provided insufficient medical documentation in support of her disability claim. *See Landsaw*, 803 F.2d at 214; *Brown*, 1990 WL 121472 at *5.

Because the ALJ's conclusions were supported by substantial evidence and he adhered to applicable regulations in declining to defer to the treating physician's opinion, the ALJ did not commit error in assessing the extent and severity of Plaintiff's mental impairments.

### 4. *Not finding combined impairments "disabling" at earlier date*

Finally, Plaintiff contends that the ALJ erred in failing to consider the extent to which Plaintiff's vision was limited before her visual impairment reached a disabling level, or to consider the combined effect of all of her medical impairments from her alleged onset date to the date that he determined her to be disabled.  (Doc. #9, alleged errors ## 8, 10).

The Social Security Act does require the Commissioner "to consider the combined effects of impairments that individually may be nonsevere, but which in combination may constitute a medically severe impairment or otherwise evince a claimant's disability." *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988) (citing 42 U.S.C. § 423(d)(2)(C)).  The a review of the ALJ's decision demonstrates, however, that ALJ Knapp complied with that statutory mandate in Plaintiff's case.  *See id.*

Despite his finding that Plaintiff did not become visually disabled within the statutory period, the ALJ's hypothetical to the vocational expert included restrictions intended to compensate for her previously-documented visual impairments, including, *e.g.*,

> [n]o climbing of ladders or scaffolds, no job that otherwise
> requires a good ability to maintain balance, no walking on
> uneven surfaces, no job requiring good depth perception or
> peripheral vision on the left, no work at unprotected heights
> or around moving machinery.

(Tr. 443-44; *see also* Tr. 24). In addition, that hypothetical reflected work-related restrictions aimed at accommodating those mental impairments that the ALJ found to be adequately established, including

> no contact with the public, occasional contact only with
> supervisors and coworkers, no complex instructions and
> limited to jobs that one would generally consider to be low
> stress in nature . . . [meaning] not involv[ing] above average
> pressure for production, fixed production quotas, work that is
> other than routine in nature or work that is hazardous.

(*Id.*). Elsewhere, the ALJ's decision adequately articulated the reasons why he did not find any other claimed impairments to be cognizable for purposes of her disability claim (*see* Tr. 18-19), and after listing all of her established "severe impairments" in his findings, he specifically found that Plaintiff "did not have . . . [a] **combination of impairments**" that equaled any of the listings. (Tr. 24) (emphasis added). All of these separate, explicit acknowledgments by the ALJ of Plaintiff's multiple medical conditions belie any suggestion that the ALJ failed to consider Plaintiff's impairments in combination in arriving at his decision regarding her disability status. *See Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990) ("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of

34

impairments' in finding that the plaintiff does not meet the listings") (citing Gooch v.

Sec'y of Health & Human Servs., 833 F.2d 589, 592 (6th Cir.1987), *cert. denied,* 484 U.S.

1075(1988)). Plaintiff's allegations of error on that basis also lack merit.

       IT THEREFORE IS **RECOMMENDED** THAT:

           1.      The Commissioner's final non-disability determination be AFFIRMED, and

           2.      This case be TERMINATED on the docket of this Court.

August 7, 2009                                 __s/Sharon L. Ovington__
                                        Sharon L. Ovington
                              United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).